United States Courts
Southern District of Texas
FILED

## *United States Court of Appeals*
FIFTH CIRCUIT
OFFICE OF THE CLERK

*August 31, 2022*

Nathan Ochsner, Clerk of Court

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

August 31, 2022

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

     No. 21-20658   USA v. Bleuler
                  USDC No. 4:17-CR-514-7
     Cons w/
     No. 22-20377   USA v. Murta
                  USDC No. 4:17-CR-514-8

The court has granted the unopposed motion to supplement or correct
the record in case no. 22-20377. The originating court is
requested to add the attached motion and documents to their court's
docket and to provide us with a supplemental electronic record.
Counsel is reminded that any citations to these documents must
cite to the supplemental electronic record.

                       Sincerely,

                       LYLE W. CAYCE, Clerk

                       By: _____
                       Christina A. Gardner, Deputy Clerk
                       504-310-7684

Mr. Frederick T. Davis
Ms. Laura G. Ferguson
Ms. Anna Elizabeth Kalluri
Mr. Samy Kamal Khalil
Mr. Joshua Bradley Lake
Ms. Margot Laporte
Ms. Carmen Castillo Mitchell
Mr. George D. Murphy Jr.
Mr. Nathan Ochsner
Ms. Sangita Katikineni Rao
Ms. Mahogane Denea Reed
Mr. Jeremy Raymond Sanders
Mr. Andrew T. Wise

IN THE UNITED STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT

No. 21-20658

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*
v.
DAISY TERESA RAFOI BLEULER,
*Defendant-Appellee.*

**CONSOLIDATED WITH**

No. 22-20377

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*
v.
PAULO JORGE DA COSTA CASQUEIRO MURTA,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
NO. 4:17-CR-514 (HON. KENNETH M. HOYT)

UNITED STATES' UNOPPOSED MOTION TO
SUPPLEMENT THE APPELLATE RECORD

The United States respectfully files this unopposed motion to supplement the

appellate record in *United States v. Murta*, No. 22-20377 (5th Cir. 2022), with the

indictment in *United States v. Rincon-Fernandez*, No. 4:15-cr-654, Dkt. 1 (S.D. Tex. Dec.

10, 2015) ("Rincon Indictment"), and the original indictment in *United States v. De Leon,*

*et al.*, No. 4:17-cr-514, Dkt. 1 (S.D. Tex. Aug. 23, 2017) ("De Leon Indictment").

1.     This is a government appeal from the district court's omnibus order suppressing evidence and dismissing, with prejudice and on multiple grounds, all four counts of the superseding indictment charging defendant-appellee Paulo Jorge Da Costa Casqueiro Murta ("Murta") with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 13); conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371 (Count 14); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Counts 18 and 19). ROA.22-20377.900-924.

2.     One of the issues on appeal is whether the government charged Murta within the relevant five-year statute-of-limitations period as tolled under 18 U.S.C. § 3292. In their arguments before the district court on this issue, the parties referenced the Rincon and De Leon Indictments, and the district court discussed both indictments in its order dismissing Murta's charges. *See* ROA.22-20377.910-918. The government's opening brief on appeal also discusses both indictments with respect to the statute-of-limitations issue.

3.     In order for this Court to have all documents relevant to its determination of this issue, the United States moves to supplement the record on appeal in *United States v. Murta*, No. 22-20377 (5th Cir. 2022), with the Rincon and De Leon Indictments. Both documents are attached to this motion.

4.     Counsel for Murta and his co-defendant Daisy Teresa Rafoi Bleuler, whose appeal is consolidated with Murta's, are unopposed to this motion.

2

Respectfully submitted,

August 31, 2022

*/s/ Mahogane D. Reed*
MAHOGANE D. REED
Trial Counsel, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
Mahogane.Reed@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on August 31, 2022, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all registered users.

/s/ Mahogane D. Reed
MAHOGANE D. REED

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limitations of <u>Federal Rule of Appellate Procedure 27(d)(2)(A)</u> because it contains 303 words.

2.      This document complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point type Garamond font.

<u>*/s/ Mahogane D. Reed*</u>
MAHOGANE D. REED

# Attachment A



United States District Court
Southern District of Texas
FILED

DEC 1 0 2015

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION



Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| ROBERTO ENRIQUE RINCON- | § | |
| FERNANDEZ, | § | |
| ABRAHAM JOSE SHIERA- | § | **15 CR 654** |
| BASTIDAS | § | |

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

#### Introduction

At all relevant times, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2.     Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates

were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  PDVSA Services, Inc. was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA.  Bariven S.A. was the PDVSA procurement subsidiary responsible for equipment purchases.  PDVSA and its wholly owned subsidiaries, including PDVSA Services, Inc. and Bariven S.A., (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).  PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

3.     PDVSA awarded contracts for energy services and equipment in a number of ways, including through a competitive bidding process.  One such competitive bidding process began with a PDVSA purchasing analyst assembling a bidding panel, which identified those companies that would be invited to submit bids in connection for a particular project.  PDVSA would then issue a request for quotation to the companies included on the bidding panel and those companies would in turn submit formal bids, from which a winner would be selected.

2

PDVSA also awarded sole source contracts, which were not subject to a competitive bidding process.

## The Defendants and Their Co-Conspirators

4.     Defendant **ROBERTO ENRIQUE RINCON FERNANDEZ** ("RINCON") was a U.S. lawful permanent resident and a resident of Texas, and controlled, together with others, a number of closely held companies, including several U.S. companies, many of which were based in the Southern District of Texas, that **RINCON** used to secure contracts with PDVSA. **RINCON** was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.     Defendant **ABRAHAM JOSE SHIERA BASTIDAS** ("SHIERA") was a Venezuelan national who resided in Florida, and controlled, together with others, a number of closely held companies, including several U.S. companies, that **SHIERA** used to secure contracts with PDVSA. **SHIERA** was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). **RINCON** and **SHIERA** worked together on a number of PDVSA contracts and contract bids.

6.      "Rincon Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 1 was controlled by **RINCON** and used by **RINCON** to secure contracts with PDVSA.

7.      "Rincon Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 2 was controlled by **RINCON** and used by **RINCON** to secure contracts with PDVSA.

8.      "Rincon Company 3," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Rincon Company 3 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 3 was controlled by **RINCON** and used by **RINCON** to secure contracts with PDVSA.

4

9.      "Rincon Company 4," a company whose identity is known to the Grand Jury, was controlled by **RINCON** and used by **RINCON** to secure contracts with PDVSA.

10.     "Shiera Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 1 was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

11.     "Shiera Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 2 was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

12.     "Shiera Company 3," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 3 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 3 was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

5

13. "Shiera Company 4," a company whose identity is known to the Grand Jury, was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

14. "Shiera Company 5," a company whose identity is known to the Grand Jury, was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

15. "Shiera Company 6," a company whose identity is known to the Grand Jury, was controlled by **SHIERA** and used by **SHIERA** to secure contracts with PDVSA.

16. "Associate 1," an individual whose identity is known to the Grand Jury, was a U.S. lawful permanent resident and a resident of Texas and a relative of **RINCON**, who controlled, along with **RINCON**, several of the U.S. companies controlled by **RINCON**.  Associate 1 was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

17. "Associate 2," an individual whose identity is known to the Grand Jury, was a Venezuelan national who maintained a residence in Texas, and was employed by, or worked as an independent contractor for, **SHIERA** and assisted both **RINCON** and **SHIERA** in their business operations, including by assisting

6

RINCON and SHIERA and their companies, including their U.S.-based companies, secure contracts with PDVSA. Thus, Associate 2 was an agent of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

## The Foreign Officials

18. "Official A," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a buyer at PDVSA and a supervisor of other PDVSA buyers. Official A's job responsibilities included assigning bidding panels to PDVSA buyers, including Official C and Official D, who would then be responsible for selecting companies for the bidding panels, which allowed those companies to submit bids on individual PDVSA projects.

19. "Official B," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a purchasing analyst for PDVSA. Official B's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects.

20. "Official C," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a purchasing manager and superintendent of purchasing at PDVSA. Official C's job responsibilities included selecting companies for bidding panels, which allowed those companies

7

to submit bids on individual PDVSA projects, and selecting which companies would win the economic portion of the bid process.

21.     "Official D," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a buyer for PDVSA. Official D's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects.

22.     "Official E," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a purchasing manager at PDVSA. Official E's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects.

23.     Official A, Official B, Official C, Official D, and Official E were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

8

## The Conspiracy

24.     Beginning in at least 2009 and continuing through at least 2014, in the Southern District of Texas, and elsewhere, the defendants,

**ROBERTO ENRIQUE RINCON FERNANDEZ**
**and**
**ABRAHAM JOSE SHIERA BASTIDAS**

did willfully and knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is:

a.  to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign

9

government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **RINCON**, **SHIERA**, and their U.S. companies in obtaining and retaining business for and with, and directing business to, **RINCON**, **SHIERA**, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a);

b.  while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect

10

and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **RINCON, SHIERA**, and their U.S. companies in obtaining and retaining business for and with, and directing business to, **RINCON, SHIERA**, their companies, and others, in violation of Title 15, United States Code, Section 78dd-3(a); and

c. to devise and intend to devise a scheme or artifice to defraud PDVSA and energy companies that could have performed services for PDVSA, and for obtaining money and property from PDVSA and energy companies that could have performed services for PDVSA by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

25.    The purpose of the conspiracy was for **RINCON, SHIERA**, and their co-conspirators, to enrich themselves by obtaining and retaining lucrative energy contracts with PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials.

11

## Manner and Means of the Conspiracy

26.     The manner and means by which **RINCON** and **SHIERA** and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

27.     **RINCON** and **SHIERA**, together with others, discussed how they would obtain and retain contracts with PDVSA by providing things of value to PDVSA officials.

28.     **RINCON** and **SHIERA**, together with others, paid bribes to PDVSA officials through the use of interstate and foreign wires in order to influence acts and decisions of the PDVSA officials in their official capacities and to induce the PDVSA officials to do and omit to do certain acts, including, but not limited to:

    a.  assisting **RINCON**'s and **SHIERA**'s companies in winning PDVSA contracts;

    b.  providing **RINCON** and **SHIERA** with inside information concerning the PDVSA bidding process;

    c.  placing one or more of **RINCON**'s and **SHIERA**'s companies on certain bidding panels for PDVSA projects;

    d.  helping to conceal the fact that **RINCON** and **SHIERA** controlled more than one of the companies on certain bidding panels for PDVSA projects;

e.  supporting **RINCON**'s and **SHIERA**'s companies before an internal

PDVSA purchasing committee;

f.  preventing interference with the selection of **RINCON**'s and **SHIERA**'s

companies for PDVSA contracts;

g.  updating and modifying contract documents, including change orders to

PDVSA contracts awarded to **RINCON**'s and **SHIERA**'s companies;

h.  assisting **RINCON**'s and **SHIERA**'s companies in receiving payment

for previously awarded PDVSA contracts, including by requesting

payment priority for projects involving **RINCON**'s and **SHIERA**'s

companies.

29.     **RINCON** and **SHIERA,** together with others, caused bribe payments

to be wired from the bank accounts of **RINCON, RINCON**'s companies, and

**SHIERA**'s companies to the bank accounts of PDVSA officials, their relatives, or

other individuals or entities designated by the PDVSA officials who received the

bribes.

30.     In addition to monetary bribes, **RINCON** and **SHIERA,** together with

others, bribed PDVSA officials by providing things of value, including recreational

travel, meals, and entertainment, in order to obtain and retain business on behalf of

**RINCON**'s and **SHIERA**'s companies.

31.     **RINCON** and **SHIERA**, together with others, referred to the PDVSA officials who were assisting them in obtaining and retaining contracts with PDVSA in exchange for bribes as "aliados," which translates into English as "allies" or "allieds."

32.     **RINCON** and **SHIERA**, together with others, provided to certain PDVSA officials who were receiving bribes proposed bidding panel lists that would include more than one company controlled by **RINCON** or **SHIERA** to create the false appearance that the bidding process was competitive.

33.     **RINCON** and **SHIERA**, together with others, relayed to certain PDVSA officials who were receiving bribes instructions as to which company among the proposed bidding panel the officials should select as the winning bidder.

34.     **RINCON** and **SHIERA**, together with others, kept track of the amounts owed and paid to each PDVSA official based on the contracts that the PDVSA official had helped to award to one or more of **RINCON**'s and **SHIERA**'s companies.

35.     **RINCON** and **SHIERA**, together with others, attempted to conceal the fact that they controlled multiple companies contained on the proposed bidding panel lists provided to certain PDVSA officials who were receiving bribes, including by appointing nominal owners or managers for those companies.

14

36. **RINCON** and **SHIERA**, together with others, attempted to conceal the bribes to certain PDVSA officials, which they referred to as "commissions," by creating false justifications for the bribes, including requesting or receiving invoices for equipment that was not provided and services that were never rendered in order to disguise the bribe payments to the PDVSA officials.

## Overt Acts

37. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

38. In or around October 2009, **RINCON** and **SHIERA** reached an agreement to work together to pay bribes to PDVSA officials in order to secure lucrative energy contracts from PDVSA for **RINCON**'s and **SHIERA**'s companies.

39. On or about October 8, 2009, Associate 2 sent an e-mail to other associates of **SHIERA** referring to a matrix "Roberto" [**RINCON**] had drafted in connection with PDVSA bidding.

40. On or about October 22, 2009, Associate 2 sent Official C an e-mail in Spanish explaining the strategy for the PDVSA bidding process as it related to companies owned by **SHIERA**, stating that for instances where Shiera Company 1

15

would be invited to submit bids, Associate 2 and Official C needed to first ensure that Shiera Company 1 would meet certain conditions and that Official C would be the PDVSA buyer responsible for assembling the panel, and that, as translated into English, "If that is the case, tell me so I can send you a panel of companies that I know will not make an offer, or they will make offers higher than ours. It is indispensable to have the complete description of the request to seek out pricing beforehand. When starting the process, it is also indispensable that you require a short submission offer timeframe (3days). Well buddy, I believe that if we follow these strategies, that shit is ours."

41.     In or around early 2010, Associate 2 helped Official B to open a bank account in Panama, in order to receive bribe payments outside Venezuela.

42.     On or about April 9, 2010, **RINCON** caused $100,000 to be transferred from a bank account in the United States in the name of one of **RINCON**'s companies to Official B's bank account in Panama.

43.     On or about April 12, 2010, **RINCON** caused $164,570.23 to be transferred from a bank account in the name of one of **RINCON**'s companies to pay off the balance of a mortgage loan in Official E's name for a residence in the Southern District of Texas, in exchange for Official E's assistance in connection with PDVSA contracts.

16

44.    On or about May 7, 2010, **RINCON** caused $135,429 to be transferred from a bank account in the name of one of **RINCON**'s companies to an account in the name of a close personal associate of Official E, but over which Official E held power of attorney, in exchange for Official E's assistance in connection with PDVSA contracts.

45.    On or about June 15, 2010, **SHIERA** sent Official C an e-mail containing information about how to open a bank account at a bank in Panama.

46.    On or about June 17, 2010, **RINCON** helped Official C open a bank account in the Southern District of Texas, into which bribes were paid.

47.    On or about May 26, 2010, approximately two weeks after PDVSA issued a $2,648,148.20 purchase order to Shiera Company 1 on which Official C was listed as the PDVSA buyer, Shiera Company 1 transferred $300,000 to Shiera Company 4.

48.    On or about June 23, 2010, **SHIERA** caused $100,000 to be transferred from a bank account in the name of Shiera Company 4 to Official C's bank account in the Southern District of Texas in exchange for Official C's assistance in connection with PDVSA contracts.

49.    On or about September 23, 2010, **RINCON** caused $100,000 to be transferred from a bank account in the name of Rincon Company 4 to Official C's

17

bank account in the Southern District of Texas in exchange for Official C's assistance in connection with PDVSA contracts.

50.   On or about October 18, 2010, approximately two weeks after PDVSA sent a wire transfer to Shiera Company 1 in the amount of $5,545,560.01, **SHIERA** caused $25,000 to be transferred from a bank account in the name of Shiera Company 4 to Official C's bank account in the Southern District of Texas in exchange for Official C's assistance in connection with PDVSA contracts.

51.   On or about January 28, 2011, **SHIERA** caused $15,000 to be transferred from a bank account in Panama in the name of Shiera Company 5 into a bank account in the Southern District of Texas held jointly in the name of Official E and a relative, in exchange for Official E's assistance in connection with PDVSA contracts.

52.   On or about June 6, 2011, **SHIERA** caused $15,000 to be transferred from a bank account in Panama in the name of Shiera Company 5 into a bank account in the Southern District of Texas held jointly in the name of Official E and a relative, in exchange for Official E's assistance in connection with PDVSA contracts.

53.   On or about August 5, 2011, approximately ten days after PDVSA issued a $7,729,756.78 purchase order to Rincon Company 3 on which Official C was listed as the buyer, Rincon Company 2 sent a sales order to Rincon Company

18

3 to provide Rincon Company 3 with substantially the same equipment Rincon Company 3 had agreed to provide to PDVSA in the purchase order referenced above, for a total price of $7,343,268.93.

54.    On or about September 29, 2011, **SHIERA** sent an e-mail to Associate 2, stating, as translated into English, "Don't forget to give me [Official A's] account statement."

55.    On or about October 27, 2011, Associate 2 sent an e-mail to **SHIERA** with the subject line, as translated into English, "Outstanding [commission] for [Official A]," and attaching an Excel spreadsheet listing numerous PDVSA contracts that had been awarded to **SHIERA**'s companies between September 1, 2010 to September 30, 2011 by various PDVSA buyers that were supervised by Official A, and listing, as translated into English, an "Outstanding commission" of $188,276.61 USD.

56.    On or about December 6, 2011, an associate of **SHIERA** sent an e-mail to Associate 2 in which he forwarded a $14,502.29 hotel reservation for Official D at the Fontainebleau Hotel in Miami Beach, Florida.

57.    On or about January 12, 2012, Associate 2 sent an e-mail to **SHIERA** and another associate of **SHIERA** attaching an invoice for whiskey that had been given to Official C with a notation, as translated into English, "with AS [**ABRAHAM SHIERA**] authorization."

19

58.     On or about January 17, 2012, the other associate replied to the e-mail referenced in Paragraph 57 above, stating, as translated into English, "Man, you shouldn't have Abraham's [**SHIERA**'s] name in the e-mail address, and do not mention mine either."

59.     On or about January 18, 2012, **SHIERA** responded to the e-mail chain referenced in Paragraph 58 above, stating, as translated into English, "authorized."

60.     On or about January 26, 2012, Associate 2 sent an e-mail to **SHIERA** and other associates of **SHIERA** whereby Associate 2 arranged for one of **SHIERA**'s companies to cover the cost of a hotel and rental car in Barcelona, Venezuela for Official D.

61.     On or about January 28, 2012, **SHIERA** responded to the e-mail referenced in Paragraph 60 above, and instructed Associate 2 to, as translated into English, "please do these things outside of accounting."

62.     On or about February 9, 2012, **RINCON** sent an e-mail to Official A, copying **SHIERA** and Associate 2, stating, as translated into English, "attached please find the Charge for Abraham's [**SHIERA**'s] company," and directing Official A to assign the bidding process to Official D.

63.     On or about March 1, 2012, Official C sent an e-mail to **RINCON** attaching panel lists for a number of bidding processes that were in the request for

quotation phase. Three of the proposed panels included Rincon Company 3 and another Rincon company. Another proposed panel included Shiera Company 2, Rincon Company 1, Rincon Company 2, and another Rincon company. Another proposed panel included Rincon Company 2, Rincon Company 3, and another Rincon company.

64. On or about March 22, 2012, **SHIERA** sent an e-mail to Associate 2 and another associate of **SHIERA**, copying **RINCON**, responding to an e-mail chain about a turbogenerator process, stating that, as translated into English, "[Rincon Company 1] should win the process. According to what Roberto approved, the commission to [Shiera Company 1] is 5% of the purchase price. That is fair. Put this in the Synergy project report. RR [**ROBERTO RINCON**] pays the commissions to the allies."

65. On or about March 27, 2012, **SHIERA** sent an e-mail to **RINCON** and an associate of **SHIERA**, copying Associate 2, stating, as translated into English, "According to what was agreed with Roberto [**RINCON**], his companies will excuse themselves from these two processes. From ours, [Shiera Company 1] wins both."

66. On or about March 23, 2012, Official C issued an invoice from a company Official C co-owned with a relative to **RINCON** at Rincon Company 2,

21

billing $150,000 for purported services that were not actually performed, including "engineering services on drilling rig GP-20."

67.     On or about April 24, 2012, **SHIERA** sent an e-mail to Official A, **RINCON**, and Associate 2 instructing Official A to "assign" a particular PDVSA contract to Official D for the assembly of the bid panel and informing Official A that Shiera Company 3 "wins" the project.

68.     On or about April 27, 2012, **RINCON** caused $150,000 to be transferred from Rincon Company 2 to a bank account in the name of a company that Official C owned with a relative referencing the invoice referenced in Paragraph 66 above in exchange for Official C's assistance in connection with PDVSA contracts.

69.     On or about May 7, 2012, Official C e-mailed **RINCON**, forwarding a response from his bank that the April 27, 2012 wire transfer referenced in Paragraph 68 above had not been credited to Official C's account because the account number had been incorrect in the wire transfer documentation, and including the correct wire information.

70.     On or about May 8, 2012, **RINCON** caused $150,000 to be transferred from Rincon Company 2 to a bank account in the name of a company that Official C owned with a relative with the correct wire information contained in

22

Paragraph 69 above in exchange for Official C's assistance in connection with PDVSA contracts.

71.    On or about May 17, 2012, Official C sent an e-mail to **RINCON** and **SHIERA** attaching a list of various PDVSA contracts coming up for bid.

72.    On or about June 22, 2012, **SHIERA** sent an e-mail to Official C, instructing Official C to assign a particular bidding process to Official D.

73.    On or about June 22, 2012, Official C responded to the e-mail referenced in Paragraph 72 above, stating that Official C had already assigned the process to Official D, and noting, as translated into English, "I am waiting for you to send me the additional specifications of that case to submit them."

74.    On or about November 5, 2012, Rincon Company 3 sent PDVSA an invoice for partial payment on the purchase order referenced in Paragraph 53 above, based on supplying some of the equipment included in the purchase order.

75.    On or about December 18, 2012, the same day that PDVSA sent Rincon Company 3 approximately $331,246.01 as payment on two invoices, Rincon Company 3 sent $314,683.72 to Rincon Company 2.

76.    On or about December 19, 2012, Official C sent **RINCON** an e-mail attaching an invoice for $150,000 from a company Official C co-owned with a relative to **RINCON** at Rincon Company 2, billing $150,000 for purported

services that were not actually performed, including "Engineering Services Steem [sic] Generator Plants."

77.    On or about December 20, 2012, **RINCON** forwarded the December 19, 2012 invoice referenced in Paragraph 76 above to others at Rincon Company 2, including Associate 1, stating, as translated into English, "please proceed with the transfer."

78.    On or about December 21, 2012, **RINCON** caused $150,000 to be transferred from Rincon Company 2's bank account to a bank account in the name of a company that Official C owned with a relative in exchange for Official C's assistance in connection with PDVSA contracts.

79.    On or about February 20, 2013, **RINCON** sent Official C an e-mail stating, as translated into English, "send one for US $100,000.00."

80.    On or about February 28, 2013, Official C sent **RINCON** an e-mail attaching an invoice for $100,500, noting that the amount was, as translated into English, "to square away the H/H [hours per person] that I included in the former invoice." The invoice was from a company Official C co-owned with a relative to **RINCON** at Rincon Company 2 for purported services that were not actually performed, including "Engineering Services Steem [sic] Generator Plants."

81.    On or about March 1, 2013, **RINCON** caused $100,460 to be transferred from a Panamanian bank account in the name of one of **RINCON**'s

24

companies to a bank account in the name of a company that Official C owned with a relative in exchange for Official C's assistance in connection with PDVSA contracts.

82.     On or about March 26, 2013, Official C sent an e-mail to **RINCON**, stating, as translated into English, "Good day, Boss, I'm sending you the personal information of the passengers," and providing dates of birth, passport numbers, and passport expiration dates for Official C, Official C's wife, Official A, Official B, and three others for an April trip to Miami, Florida.

83.     On or about January 3, 2014, **SHIERA** caused $15,000 to be transferred from a bank account in Panama in the name of Shiera Company 6 into a bank account in the Southern District of Texas held jointly in the name of Official E and a relative, in exchange for Official E's assistance in connection with PDVSA contracts.

84.     On or about January 7, 2014, **SHIERA** caused $15,000 to be transferred from a bank account in Panama in the name of Shiera Company 6 into a bank account in the Southern District of Texas held jointly in the name of Official E and a relative, in exchange for Official E's assistance in connection with PDVSA contracts.

All in violation of Title 18, United States Code, Section 371.

25

## COUNTS TWO – FIVE
### (Foreign Corrupt Practices Act – 15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

85.     Paragraphs 1 through 23 and 25 through 84 are realleged and incorporated by reference as though fully set forth herein.

86.     On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

**ROBERTO ENRIQUE RINCON FERNANDEZ,**

being a domestic concern and an officer, director, employee, agent, and shareholder of a domestic concern, and by aiding and abetting a domestic concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts

26

and decisions of such government and agencies and instrumentalities, in order to assist **RINCON, SHIERA**, and their U.S. companies in obtaining and retaining business for and with, and directing business to, **RINCON, SHIERA**, their companies, and others, as follows:

| COUNT | DATE | BRIBE PAYMENT |
|-------|------|---------------|
| Two | September 23, 2010 | $100,000 wire transfer from Rincon Company 4's bank account in Florida to Official C's bank account in the Southern District of Texas. |
| Three | April 12, 2011 | $200,000 check from **RINCON**'s bank account in the Southern District of Texas to a bank account in Florida in the name of a company owned by an associate of Official C. |
| Four | May 8, 2012 | $150,000 wire transfer from Rincon Company 2's bank account in the Southern District of Texas to a bank account in New York in the name of a  company co-owned by Official C. |
| Five | December 21, 2012 | $150,000 wire transfer from Rincon Company 2's bank account in the Southern District of Texas to a bank account in Florida in the name of a company co-owned by Official C. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## COUNTS SIX – TEN
### (Foreign Corrupt Practices Act – 15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

87.     Paragraphs 1 through 23 and 25 through 84 are realleged and incorporated by reference as through fully set forth herein.

88.     On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### ABRAHAM JOSE SHIERA BASTIDAS,

being a domestic concern and an officer, director, employee, agent, and shareholder of a domestic concern, and by aiding and abetting a domestic concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts

28

and decisions of such government and agencies and instrumentalities, in order to assist **RINCON**, **SHIERA**, and their U.S. companies in obtaining and retaining business for and with, and directing business to, **RINCON**, **SHIERA**, their companies, and others, as follows:

| COUNT | DATE | BRIBE PAYMENT |
|-------|------|---------------|
| Six | October 18, 2010 | $25,000 wire transfer from Shiera Company 4's bank account in Panama to Official C's bank account in the Southern District of Texas. |
| Seven | June 6, 2011 | $15,000 wire transfer from Shiera Company 5's bank account in Panama to a bank account in the Southern District of Texas held jointly by Official E and a relative. |
| Eight | August 6, 2012 | $120,000 wire transfer from Shiera Company 6's bank account in Panama to a bank account in Florida in the name of a company Official C co-owned with a relative. |
| Nine | January 3, 2014 | $15,000 wire transfer from Shiera Company 6's bank account in Panama to a bank account in the Southern District of Texas held jointly by Official E and a relative. |
| Ten | January 7, 2014 | $15,000 wire transfer from Shiera Company 6's bank account in Panama to a bank account in the Southern District of Texas held jointly by Official E and a relative. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## COUNT ELEVEN
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

89.     Paragraphs 1 through 23 and 25 through 84 are realleged and incorporated by reference as though fully set forth herein.

90.     From in or around 2009, and continuing through at least 2014, in the Southern District of Texas and elsewhere, the defendants,

### ROBERTO ENRIQUE RINCON FERNANDEZ
### and
### ABRAHAM JOSE SHIERA BASTIDAS,

did knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a.  knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and

30

78dd-3, and wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

b. to engage in a monetary transaction by, through and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, and wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1957.

## Manner and Means of the Conspiracy

91.     The manner and means by which **RINCON**, **SHIERA**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

92.     **RINCON** and **SHIERA**, together with others, procured illegal proceeds from PDVSA by securing lucrative energy contracts from PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials.

31

93. **RINCON** and **SHIERA**, together with others, assisted certain PDVSA officials in opening bank accounts, including bank accounts outside of Venezuela, for the PDVSA officials to receive bribe payments.

94. **RINCON** and **SHIERA**, together with others, engaged in monetary transactions among their various companies designed to conceal the nature, source, and ownership of the proceeds of the specified unlawful activity.

95. **RINCON** and **SHIERA**, together with others, transferred money among and between the bank accounts of their respective companies in order to conceal the nature, source, and ownership of bribe payments to PDVSA officials.

96. **RINCON** and **SHIERA**, together with others, created false justifications for certain of the bribes, including invoices for services that were never performed, for the purpose of concealing and disguising the nature, source, and ownership of those bribe payments, which they referred to as "commissions."

97. **RINCON** and **SHIERA**, together with others, directed the wire transfer of, and caused to be wired, bribe payments from bank accounts which were frequently in the name of companies other than the companies being awarded PDVSA contracts, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

98. **RINCON** and **SHIERA**, together with others, directed bribe payments to be sent to various recipients other than the intended PDVSA officials,

32

including companies, relatives, friends, and close personal associates of the PDVSA officials, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

99. **RINCON** and **SHIERA**, together with others, engaged in monetary transactions of a value greater than $10,000 using money procured through the corrupt and fraudulent scheme.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWELVE – FOURTEEN
**(Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)**

100. Paragraphs 1 through 23, 25 through 84, and 91 through 99 are realleged and incorporated by reference as though fully set forth herein.

101. On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendants,

**ROBERTO ENRIQUE RINCON FERNANDEZ**
**and**
**ABRAHAM JOSE SHIERA BASTIDAS,**

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, and wire fraud, Title 18, United States Code, Section 1343, as follows:

34

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Twelve | October 20, 2011 | $5,700,800 wire transfer from Shiera Company 2's bank account in Florida to Rincon Company 2's bank account in the Southern District of Texas. |
| Thirteen | November 4, 2011 | $1,353,954.25 wire transfer from Shiera Company 2's bank account in Florida to Rincon Company 2's bank account in the Southern District of Texas. |
| Fourteen | January 17, 2012 | $1,479,716.03 wire transfer from Shiera Company 2's bank account in Florida to Rincon Company 2's bank account in the Southern District of Texas. |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS FIFTEEN – EIGHTEEN
### (Money Laundering – 18 U.S.C. § 1957; 18 U.S.C. § 2)

102.   Paragraphs 1 through 23, 25 through 84, and 91 through 99 are realleged and incorporated by reference as though fully set forth herein.

103.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendants,

**ROBERTO ENRIQUE RINCON FERNANDEZ**
**and**
**ABRAHAM JOSE SHIERA BASTIDAS,**

did knowingly engage, and aid, abet, and cause others to engage, and attempt to engage in the following monetary transactions, by, through, and to a financial institution, affecting interstate and foreign commerce, to wit: the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, and wire fraud, Title 18, United States Code, Section 1343, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Fifteen | May 23, 2011 | $4,962,000 wire transfer from Rincon Company 1's bank account in the Southern District of Texas to a bank account in Switzerland in the name of Company Accountholder A. |

36

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Sixteen | May 24, 2011 | $15,000,000 wire transfer from Rincon Company 1's bank account in the Southern District of Texas to a bank account in Switzerland in the name of Company Accountholder B. |
| Seventeen | June 17, 2011 | $2,428,005 wire transfer from Rincon Company 1's bank account in the Southern District of Texas to a bank account in Switzerland in the name of Company Accountholder A. |
| Eighteen | January 17, 2012 | $3,097,527 wire transfer from Shiera Company 2's bank account in Florida to a bank account in Switzerland in the name of Company Accountholder C. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

104.   Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

**ROBERTO ENRIQUE RINCON FERNANDEZ**
**and**
**ABRAHAM JOSE SHIERA BASTIDAS,**

that in the event of conviction of any of the offenses charged in Counts 1 through 10 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

105.   Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants,

**ROBERTO ENRIQUE RINCON FERNANDEZ**
**and**
**ABRAHAM JOSE SHIERA BASTIDAS,**

that upon conviction of any of the offenses charged in Counts 11 through 18 of this Indictment, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

38

## Property Subject to Forfeiture

106.   Defendants are notified that the property subject to forfeiture includes, but is not limited to, the following property:

   a.  Bank Account of Company Accountholder A at Credit Suisse in
       Switzerland, with an account number ending in 6032;

   b.  Bank Account of Company Accountholder B at Credit Suisse in
       Switzerland, with an account number ending in 9852;

   c.  Bank Account of Company Accountholder C at Credit Suisse in
       Switzerland; with an account number ending in 2004; and

   d.  Sunseeker Manhattan 73 Motor Yacht, Serial Number GB-XSK 05811
       J213, co-owned by **SHIERA**.

## Money Judgment

107.   Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable.

## Substitute Asset Provision

108.   Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants,

   a.  Cannot be located upon the exercise of due diligence;

39

b. Has been transferred or sold to, or deposited with, a third person;

c. Has been placed beyond the jurisdiction of the Court;

d. Has been substantially diminished in value; or

e. Has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the

defendants up to the total value of such property pursuant to Title 21, United States

Code, Section 853(p), incorporated by reference in Title 28, United States Code,

Section 2461(c) and Title 18, United States Code, Section 982(b)(1).


A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON


KENNETH MAGIDSON
UNITED STATES ATTORNEY

ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE


BY: _____

JOHN P. PEARSON
DEPUTY CHIEF
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEY

BY: _____

AISLING O'SHEA
JEREMY R. SANDERS
TRIAL ATTORNEYS


40

# Attachment B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

AUG 29 2017

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| LUIS CARLOS DE LEON-PEREZ, | § | |
| NERVIS GERARDO | § | **17 CR 514** |
| VILLALOBOS-CARDENAS, | § | |
| CESAR DAVID RINCON-GODOY, | § | |
| ALEJANDRO ISTURIZ-CHIESA, | § | |
| AND RAFAEL ERNESTO | § | **UNDER SEAL** |
| REITER-MUNOZ, | § | |
| | § | |
| DEFENDANTS | § | |

## <u>INDICTMENT</u>

THE GRAND JURY CHARGES:

### <u>GENERAL ALLEGATIONS</u>

At all relevant times, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or

retaining business for, or directing business to, any person.

2.     Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  PDVSA Services, Inc. was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA.  Bariven S.A. ("Bariven") was the PDVSA procurement subsidiary responsible for equipment purchases.  PDVSA and its wholly owned subsidiaries, including PDVSA Services, Inc. and Bariven, (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).  PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.     PDVSA awarded contracts for energy services and equipment in a number of ways, including through a competitive bidding process.  One such competitive bidding process began with a PDVSA purchasing analyst assembling a bidding panel, which identified those companies that would be invited to submit bids in connection for a particular project.  PDVSA would then issue a request for

2

quotation to the companies included on the bidding panel and those companies would in turn submit formal bids, from which a winner would be selected. PDVSA also awarded sole source contracts, which were not subject to a competitive bidding process. Ultimately, all contracts needed to be approved by more senior PDVSA employees.

4. Beginning in at least 2011 and continuing until at least 2013, **LUIS CARLOS DE LEON PEREZ, NERVIS GERARDO VILLALOBOS CARDENAS, CESAR DAVID RINCON GODOY, ALEJANDRO ISTURIZ CHIESA,** and **RAFAEL ERNESTO REITER MUNOZ** (collectively, the "Defendants" described more fully below), solicited PDVSA vendors for bribes and kickbacks in exchange for providing assistance to those vendors in connection with their PDVSA business, including assisting them in obtaining PDVSA contracts and assisting them in receiving payment priority over other vendors for outstanding PDVSA invoices during the Venezuelan liquidity crisis.

5. The Defendants then laundered the proceeds of the bribery scheme through numerous financial transactions, including through international wire transfers to and from bank accounts that they opened in Switzerland, Curaçao, and elsewhere in the names of various companies.

6. The Defendants sought to conceal the nature of the scheme through various complex financial transactions by directing bribe payments to be sent to

3

various recipients other than the intended PDVSA officials, including companies, intermediaries, relatives, friends, creditors, and close personal associates of the PDVSA officials.

## The Defendants

7.      Defendant **LUIS CARLOS DE LEON PEREZ ("DE LEON")** was a dual citizen of the United States and Venezuela. **DE LEON** was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). **DE LEON** had previously been employed by instrumentalities of the Venezuelan government, but was no longer so employed during the relevant period.

8.      Defendant **NERVIS GERARDO VILLALOBOS CARDENAS ("VILLALOBOS")**, aka "Enano," was a citizen of Venezuela. **VILLALOBOS** had previously been employed by the Venezuelan government and instrumentalities thereof, but was no longer so employed during the relevant period.

9.      Defendant **CESAR DAVID RINCON GODOY ("CESAR RINCON")**, aka "Primo," was a citizen of Venezuela. At all relevant times, **CESAR RINCON** was employed by PDVSA and its subsidiaries, including Bariven, in various capacities, including as the general manager of Bariven. **CESAR RINCON** was a "foreign official" as that term is used in the FCPA, Title

4

15, United States Code, Section 78dd-2(h)(2)(A).

10.    Defendant **ALEJANDRO ISTURIZ CHIESA ("ISTURIZ")**, aka "Piojo" and "Paulo," was a citizen of Venezuela.  During the relevant period, **ISTURIZ** was employed by Bariven as an assistant to the president of Bariven. **ISTURIZ** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

11.    Defendant **RAFAEL ERNESTO REITER MUNOZ ("REITER")**, aka "Nadal," was a citizen of Venezuela.  At all relevant times, **REITER** was employed by PDVSA as head of security and loss prevention.  **REITER** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

### The Defendants' Associates and Co-Conspirators

12.    "CESAR RINCON Relative 1," an individual whose identity is known to the Grand Jury, was a relative of **CESAR RINCON**.

13.    "ISTURIZ Associate 1," an individual whose identity is known to the Grand Jury, provided financial services to **ISTURIZ**.

14.    "REITER Relative 1," an individual whose identity is known to the Grand Jury, was a close relative of **REITER**.

15.    Roberto Enrique Rincon Fernandez ("Rincon"), aka "Pelon," who has been charged separately, was a U.S. lawful permanent resident and a resident of

Texas, and controlled, together with others, a number of closely-held companies, including several U.S. companies, many of which were based in the Southern District of Texas, that Rincon used to secure contracts with PDVSA. Rincon was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

16.    "Rincon Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 1 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

17.    "Rincon Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 2, along with its Venezuelan-based affiliate (hereinafter collectively referred to as Rincon Company 2), was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

18.    "Rincon Company 3," a company whose identity is known to the

6

Grand Jury, was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

19.     "Rincon Company 4," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 4 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 4 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

20.     "Rincon Company 5," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 5 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 5 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

21.     "Rincon Company 6," a company whose identity is known to the Grand Jury, was controlled by Rincon. Rincon Company 6 was organized under the laws of Texas. Rincon Company 6 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

22.     "Rincon Company 7," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the

7

Southern District of Texas. Rincon Company 7 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 7 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

23.    "Rincon Associate 1," an individual whose identity is known to the Grand Jury, provided Rincon with certain professional services.

24.    Abraham Jose Shiera Bastidas ("Shiera"), aka "Puma," who has been charged separately, was a Venezuelan national who resided in Florida, and controlled, together with others, a number of closely-held companies, including several U.S. companies, that Shiera used to secure contracts with PDVSA. Shiera was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon and Shiera worked together on a number of PDVSA contracts and contract bids.

25.    "Shiera Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Shiera Company 1 was

8

controlled by Shiera and used by Shiera to secure contracts with PDVSA.

26. "Shiera Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Shiera Company 2 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

27. "Shiera Company 3," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 3 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Shiera Company 3 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

28. "Shiera Company 4," a company whose identity is known to the Grand Jury, was controlled by Shiera.

29. "Shiera Company 5," a company whose identity is known to the Grand Jury, was controlled by Shiera.

30. "Shiera Company 6," a company whose identity is known to the Grand Jury, was controlled by Shiera.

31. "Businessman 3," an individual whose identity is known to the Grand Jury, was a U.S. lawful permanent resident and a resident of Florida, and controlled, together with others, a number of closely-held companies, including

9

several U.S. companies, that Businessman 3 used to secure contracts with PDVSA. Businessman 3 was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

32.     "Swiss Company A," whose identity is known to the Grand Jury, was a Swiss wealth management firm.

33.     "Swiss Banker 1," an individual whose identity is known to the Grand Jury, was a partner in Swiss Company A.

34.     "Official A," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a senior executive of Bariven.

35.     "Official B," an individual whose identity is known to the Grand Jury, was at all relevant times a senior Venezuelan government official.

36.     Official A and Official B were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A).

### Other Entities

37.     "Law Firm 1," whose identity is known to the Grand Jury, was a U.S.-based law firm.

38.     "Production Company A," whose identity is known to the Grand Jury, was a U.S.-based film production company.

10

## COUNT ONE
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

39.     Paragraphs 1 through 38 are realleged and incorporated by reference as though fully set forth herein.

40.     From in or around 2011 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendants,

**LUIS CARLOS DE LEON PEREZ**
**NERVIS GERARDO VILLALOBOS CARDENAS**
**CESAR DAVID RINCON GORDOY**
**ALEJANDRO ISTURIZ CHIESA**
**and**
**RAFAEL ERNESTO REITER MUNOZ**

did knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

a.  knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony

11

violation of the FCPA, Title 15, United States Code, Sections 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

b. with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, transport, transmit, or transfer funds from a place in the United States to a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## <u>Manner and Means of the Conspiracy</u>

41.     The manner and means by which **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ, REITER**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

42.     **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** promised Rincon, Shiera, and others known and unknown to the Grand Jury assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning new PDVSA contracts, in exchange for bribe payments.

43.     **DE LEON, VILLALOBOS, CESAR RINCON,** and **ISTURIZ** solicited assistance, and in turn Rincon, Shiera, and Swiss Banker 1, together with

others, assisted the PDVSA officials in opening bank accounts, including bank accounts in Switzerland, for the PDVSA officials and their co-conspirators to receive bribe payments.

44.   **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** directed bribe payments to be sent to various recipients other than the intended PDVSA officials, including companies, intermediaries, relatives, friends, creditors, and close personal associates of the PDVSA officials, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

45.   **DE LEON** and **VILLALOBOS**, together with others, engaged in monetary transactions among their various accounts designed to conceal the nature, source, and ownership of the proceeds of the specified unlawful activity.

46.   Swiss Banker 1 and **CESAR RINCON**, each and together with others, created false justifications for certain of the bribes, including invoices for services that were never performed, for the purpose of concealing and disguising the nature, source, and ownership of those bribe payments.

47.   Rincon and Shiera, together with others, directed the wire transfer of, and caused to be wired, bribe payments from bank accounts which were frequently in the name of companies other than the companies being awarded PDVSA contracts and receiving payments from PDVSA, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

## Acts In Furtherance of the Conspiracy

48.     Beginning in at least 2010, Venezuela began to experience a liquidity crisis as the profits earned through PDVSA, which historically had been a significant source of revenue to the Venezuelan government as a result of its oil reserves, were insufficient to meet the government's expenses.  Numerous analysts began to speculate that PDVSA could default on its debt, and the government made public commitments for PDVSA to increase oil production.

49.     Given these liquidity problems, PDVSA was unable to pay all of its vendors in a timely manner, but remained under pressure to continue to escalate oil production.

50.     In or about 2011, Rincon and Shiera were approached by a group of individuals who consisted of then-current PDVSA officials and individuals outside PDVSA with influence at PDVSA, including **DE LEON**, **VILLALOBOS**, and **ISTURIZ**, referred to as the "management team."  The management team offered to give Rincon's and Shiera's companies payment priority over other PDVSA vendors, ensuring that Rincon's and Shiera's companies would get at least partial payment on outstanding PDVSA invoices, and to provide Rincon's and Shiera's companies with assistance in winning future PDVSA business, in exchange for providing a bribe to the management team in the amount of 10% of all payments Rincon and Shiera received from PDVSA.  The management team made similar

14

offers to other vendors known and unknown to the Grand Jury. In addition, individual members of the management team solicited additional bribe payments from Rincon and Shiera.

51. **DE LEON** and **VILLALOBOS** explained that the bribe proceeds would be split and would be shared among **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ, REITER, OFFICIAL A,** and **OFFICIAL B.**

52. Rincon and Shiera agreed to make the payments to the management team in exchange for payment priority and assistance in winning future PDVSA contracts.

53. Because they were able to guarantee payment through the corrupt scheme, Rincon and Shiera continued to supply goods and services to PDVSA, thereby enabling PDVSA to continue to do business with such vendors who might not otherwise accept the risk of non-payment.

54. Payment allocation decisions for vendors were typically documented by Bariven in weekly reports entitled, as translated into English, "Proposal for Payment to International Providers for the Procurement of Materials, Equipment, and Food in Foreign Markets On Behalf of PDVSA and its Subsidiaries." These documents, generally referred to in shorthand (as translated into English) as the payment proposals or proposals, typically contained a "Premise" stating, as translated into English, "The invoicing included in this payment schedule was

15

coordinated with the international offices of procurement (Houston and the Netherlands) in line with the agreed upon payment conditions and the operational needs coordinated between the hierarchic levels of Bariven and PDVSA's different businesses to ensure the delivery of materials and equipment in order to safeguard the operational continuity of the Industry," then set forth the debt and proposed payments to selected vendors. The payment proposals were the subject of extensive communications among the Defendants and their co-conspirators, including discussions about how much would be allocated to and among Rincon's and Shiera's companies and discussions about the bribe payments due to the Defendants as a function of how much Rincon's and Shiera's companies were receiving from PDVSA. **CESAR RINCON** and **ISTURIZ** had responsibility for developing and approving the payment proposals, which were ultimately authorized by Official A.

### Account Set-Up

55.    In order to facilitate the bribe payments and conceal their nature and ownership, **DE LEON** and **VILLALOBOS** and their co-conspirators engaged Swiss Company A to set up Swiss bank accounts into which bribe payments could be received and to assist in providing justifications for the payments.

56.    Ultimately, a number of accounts, in Switzerland and elsewhere, were used in connection with the scheme. These accounts were used to funnel the bribes

from, to, and through multiple destinations before reaching their ultimate recipient.

57. "Swiss Account 1," whose identity is known to the Grand Jury, was a Swiss bank account for which **DE LEON** was a beneficial owner and **VILLALOBOS** and **DE LEON** were authorized signers. Swiss Account 1 was used in connection with the scheme.

58. "Swiss Account 2," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 2 was used in connection with the scheme.

59. "Swiss Account 3," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 3 was used in connection with the scheme.

60. "Swiss Account 4," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 4 was used in connection with the scheme.

61. "Swiss Account 5," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Rincon and Shiera. Swiss Account 5 was used in connection with the scheme.

62. "Swiss Account 6," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Shiera. Swiss Account 6 was used in connection with the scheme.

63. "Swiss Account 7," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by **ISTURIZ**. Swiss Account 7 was

17

used in connection with the scheme.

64.     "Swiss Account 8," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by **CESAR RINCON**.  Swiss Account 8 was used in connection with the scheme.

65.     "Swiss Account 9," whose identity is known to the Grand Jury, was a Swiss bank account.  Swiss Account 9 was used in connection with the scheme.

66.     "Curaçao Account 1," whose identity is known to the Grand Jury, was a Curaçaoan bank account.   Curaçao Account 1 was used in connection with the scheme.

67.     "U.S. Account 1," whose identity is known to the Grand Jury, was a U.S. bank account.  U.S. Account 1 was used in connection with the scheme.

68.     Some of these accounts were not simply used to funnel bribe payments, but also to provide false justifications for the payments themselves.  For example, on or about September 12, 2011, a letter and services agreement was submitted through Swiss Company A to a Swiss bank in connection with the request to open Swiss Account 1.  The letter set forth a purported sub-contracting arrangement between Swiss Account 5 and Swiss Account 1 in which Swiss Account 1 was to assist Swiss Account 5 in providing services to Rincon Company 1.  Similarly, on or about April 19, 2012, Swiss Accounts 2, 3, and 4 sent a letter to Swiss Company A and Swiss Account 1 stating the general fund distribution from

18

Swiss Account 1 to Swiss Accounts 2, 3, and 4 and setting forth various services purportedly provided by Swiss Accounts 2, 3, and 4 on behalf of Swiss Account 1 to Swiss Account 5 and Shiera Company 5.

69.     The Defendants, Shiera, Rincon, and their co-conspirators communicated, including via e-mail, phone, and various messaging applications, about the account set-up and the need to submit documentation to justify the payments.  For example, on or about September 8, 2011, Shiera sent **VILLALOBOS** a message using BlackBerry Messenger ("BBM") stating, as translated into English, "The institution has not accepted the stick.  They are asking me for invoices and purchase orders.  I already submitted them.  I hope it is resolved tomorrow."  The conspirators frequently used the word "stick" (as translated into English) to refer to money.

70.     The Defendants ultimately established a complex web of bank accounts through which to conduct the financial transactions in connection with the scheme and conceal the nature and ownership of the proceeds.  On or about September 16, 2011, Swiss Banker 1 wrote to Shiera, **VILLALOBOS,** and **DE LEON** to report that Swiss Company A had set up four bank accounts – Swiss Account 1, which Swiss Banker 1 referred to as the "main account," Swiss Account 2, which Swiss Banker 1 identified as being for **VILLALOBOS**, Swiss Account 3, which Swiss Banker 1 identified as being for **DE LEON,** and Swiss

19

Account 4, which Swiss Banker 1 identified as being for Official A. Swiss Banker 1 concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

71.    Swiss Company A, facilitated by Rincon and Shiera, also assisted the Defendants in opening individual accounts in the names of various entities rather than in the Defendants' own names. For example, on or about February 1, 2013, **CESAR RINCON** sent Shiera an e-mail attaching his passport and utility bill. Shiera then forwarded this information to Swiss Banker 1, who requested in addition a copy of **CESAR RINCON**'s curriculum vitae. Swiss Banker 1 asked Shiera, "Shall I go ahead and order a new Nevis company for Cesar?" Shiera replied to the e-mail, noting his agreement.

72.    On or about February 6, 2013, Swiss Banker 1 sent Shiera an e-mail stating, "A new Nevis company called [Swiss Account 8] will be formed with Cesar as the Director/BO/Shareholder."

### Payments to the Management Team and Official Assistance to Rincon and Shiera

73. ·    Rincon and Shiera made payments for the benefit of **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** using a variety of bank accounts in the United States (including in the Southern District of Texas), Switzerland, and Panama, to a variety of bank accounts, including, but not limited

20

to, the accounts referenced in Paragraphs 57 to 67 above.

74.    For example, in total, accounts controlled by Rincon and Shiera transferred over $27 million to Swiss Account 1, which transferred over $10 million to Swiss Account 2, over $16 million to Swiss Account 3, and over $1 million to Swiss Account 4, in connection with the scheme.

75.    In exchange for these bribe and kickback payments, **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** provided assistance to Rincon and Shiera in getting paid on outstanding PDVSA invoices and obtaining new PDVSA contracts.

76.    For example, on or about October 10, 2011, **ISTURIZ** sent Shiera a BBM message stating, as translated into English, "I got for you and Pelon [Rincon] [Rincon Company 4] 1.3mm [Rincon Company 2] 1.2mm and [Shiera Company 2] 6.9." Shiera replied, as translated into English, "That [Shiera Company 2] is his. I need in [Shiera Company 1] and [Shiera Company 3]. Check it please." **ISTURIZ** later responded, as translated into English, "Shit, bro, I had sent it already! Let me see what I can do!", to which Shiera replied, "Change it please." **ISTURIZ** responded, as translated into English, "Pumita! [Shiera] Relax, let Piojo [**ISTURIZ**] pamper you!", to which Shiera replied, as translated into English, "I'm

in need of love $$$$$$ hahahaha."

77.    Consistent with **ISTURIZ**'s BBM message, on or about October 17, 2011, PDVSA sent $6,980,000 to Shiera Company 2.

78.    After several inter-company transfers, the funds referenced in Paragraph 77 above were ultimately transferred to Rincon Company 2.  On or about October 26, 2011, Rincon Company 2 transferred $515,513.20 to Swiss Account 1.  Shortly thereafter, on or about November 2, 2011, Shiera Company 5 transferred $179,552.52 to Swiss Account 1.  Then, on or about November 16, 2011, Swiss Account 1 transferred $100,000 to Swiss Account 2, $330,000 to Swiss Account 3, and $215,000 to Swiss Account 4.

79.    The Defendants frequently checked with Shiera and Rincon on the status of the bribe payments.  For example, on or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, it Is vital the flow comes in December," which the conspirators understood to refer to bribe payments.  Shiera responded, as translated into English, "He just confirmed you'll have it before this Friday."

80.    On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the

22

amount of $362,485.68.

81.    Rincon and Shiera frequently used **DE LEON** and **VILLALOBOS** as intermediaries for communications with or about the PDVSA officials. For example, on or about November 24, 2011, Shiera sent **VILLALOBOS** a BBM message stating, as translated into English, "Brother, Piojo [**ISTURIZ**] never fails. He put mine at like $3.5M on the proposal and 5 for the ones from Pelon [Rincon] according to what we talked about at dinner.  Give him support." **VILLALOBOS** responded, as translated into English, "That guy is good."

82.    In addition to help getting paid on outstanding invoices, Rincon and Shiera also asked the Defendants for their assistance in winning PDVSA contracts. For example, on or about January 4, 2012, Shiera sent **VILLALOBOS** a BBM message requesting **VILLALOBOS**'s assistance in securing a contract over a competitor to supply equipment in relation to a PDVSA project.

83.    On or about February 8, 2012, Shiera sent **ISTURIZ** a BBM message asking, as translated into English, "What's happened with the Motorgenerators?" to which **ISTURIZ** replied, as translated into English, "Cesar must sign it!  I'll tell him."

84.    The Defendants corresponded with Rincon and Shiera about PDVSA bidding panels as well as the official actions the Defendants would take on behalf of Rincon and Shiera.  For example, on or about February 24, 2012, Shiera sent

23

**ISTURIZ** a BBM message with a proposed panel of bidders for an electric equipment panel. **ISTURIZ** responded, as translated into English, "Good!  Give me the panels for the others!!  Get people moving on that!  Look, I have all the purchasers from my office beating them hard," to which Shiera replied, as translated into English, "That is my Piojo."

85.    In addition to allowing Rincon and Shiera to have input on PDVSA bidding panels, as discussed in Paragraph 84 above, the Defendants gave Rincon and Shiera inside information on upcoming PDVSA projects so that they could choose the projects that their companies bid on.  For example, on or about February 28, 2012, **ISTURIZ** e-mailed Rincon and Shiera, stating, as translated into English, "I'm sending you a list of the process that we need to start tomorrow. They're processes for the E&P [exploration and production] and Gas moments.  I started with e&p, because that's where the strength lies!  I need to know before 10 am in which processes you want to get involved in and the panel."

86.    On or about March 1, 2012, Rincon responded to the email from **ISTURIZ** referenced in Paragraph 85 above, copying Shiera, stating, as translated into English, "Attached you will find what we are going to work on highlighted in YELLOW.  These are drilling parts and equipment.  There is one from Abraham." Attached was a highlighted list of equipment PDVSA sought to purchase with the

24

corresponding internal budgets.

87.    The Defendants frequently sent Rincon and Shiera updates of the money they expected to receive in bribes in exchange for the payments Rincon and Shiera were receiving on outstanding PDVSA invoices as a result of the bribery scheme.  The Defendants occasionally sent Rincon and Shiera the payment proposals themselves, either in draft form for input or in final form so Rincon and Shiera could see how much money their companies were expected to receive (and, in turn, how much they would need to pay in bribes).  For example, on or about January 5, 2012, **ISTURIZ** sent Rincon an e-mail stating, as translated into English, "I need you to check these numbers.  They are the payments for payment proposal.  The date that is on each payment corresponds to the Monday of the week of the proposal.  The date will not coincide with the one on which you received the money, don't focus on that, just the amounts."  Attached was a PDVSA payment proposal document setting forth vendors to be paid, (including a number of Rincon's companies) and the dates and amounts of the payments.

88.    In addition, on or about May 17, 2013, **CESAR RINCON** sent himself a PDVSA payment proposal from his PDVSA e-mail account to a personal e-mail account.  He forwarded it to **VILLALOBOS**, Shiera, and Rincon with the message, as translated into English, "I've attached the proposal reviewed and approved by [Official A]."  The attached payment proposal included payments to a

number of Shiera's and Rincon's companies, including Shiera Company 1, Shiera Company 2, Shiera Company 3, Rincon Company 2, Rincon Company 5, and Rincon Company 7.

89.     The Defendants also frequently reminded Rincon and Shiera of how much they owed in bribe payments, using coded or vague language to conceal what they were talking about. For example, on or about March 15, 2012, **DE LEON** sent Shiera a BBM message stating, as translated into English, "Were you able to able to buy the things?  Debt from the friends as of today $1,093,232," which the conspirators understood to be a reference to outstanding bribe payments.

90.     Within a week of **DE LEON**'s message, accounts controlled by Shiera and Rincon then made a series of transfers to Swiss Account 1, totaling just over $1 million.  On or about March 19, 2012, Swiss Account 5 transferred $536,005.42 to Swiss Account 1.  The next day, March 20, 2012, Shiera Company 5 transferred $281,781.34 to Swiss Account 1.  Finally, on or about March 22, 2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

91.     In order to conceal the nature and ownership of the bribe proceeds, **ISTURIZ** sent Rincon and Shiera instructions to pay various bank accounts, held in the names of various companies.  **ISTURIZ** made coded references to paying bribes in exchange for future PDVSA business.  For example, on or about March 22, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into

26

English, "Hi P and P, I'm sending you the coordinates in order for you to send me something to buy coal to keep cooking the stew. . . . We can use this account while we're opening the other one." **ISTURIZ** concluded the e-mail with the account and wire information for Curaçao Account 1.

92.     On or about April 2, 2012, Rincon Company 2 transferred $450,000 from its bank account in the Southern District of Texas to Curaçao Account 1. Over the following several weeks, Curaçao Account 1 made a series of transfers to Swiss Account 7.

93.     On or about May 13, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear friends, I'm sending you the coordinates to move ahead somewhat on the payments while the other account is being opened.  I need to notify the friend at the bank before the money arrives. Attached is a spreadsheet showing a summary of the payments over the past 3 weeks." Set forth below was the account and wire information for Swiss Account 7. Attached was a chart setting forth various Rincon and Shiera companies, the amounts they had been paid by PDVSA for a three-week period and two figures representing bribe payments due in the amount of 10% and 2%.

94.     On or about May 16, 2012, Rincon Company 2 transferred $116,949.72 to Curaçao Account 1.  Subsequently, Curaçao Account 1 made two

transfers to Swiss Account 7.

95.    On or about June 1, 2012, Rincon Company 2 transferred $766,428.39 to Swiss Account 7.

96.    On or about June 18, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear colleagues, I am sending you the Excel file with the summary of the payments and the great debt you have with Paulo!"

97.    On or about June 19, 2012, Rincon responded to **ISTURIZ**, stating, as translated into English, "To date we have transferred the following amounts: 450,000 [Curaçao Account 1], 116,949.72 [Curaçao Account 1], 766,428.39 [Swiss Account 7], 367,069.19 [Swiss Account 7]. THE TOTAL IS...USD 1,700,447.30. Paulo, the problem is that sometimes we take the amount considering the entire payment and sometimes we need to subtract 5% for our allies'... Forgive the trouble but it is being deposited today and this way we have a difference of USD 000000000000000000000000000.00."

98.    On or about June 19, 2012, Rincon Company 2 transferred $367,069.19 to Swiss Account 7.

99.    On or about June 21, 2012, Rincon Company 6 transferred $69,427.81 to Swiss Account 7.

100.    Rincon frequently sent confirmations of bribe payments he had made

28

to the defendants.  For example, on or about May 15, 2012, Rincon Company 2 transferred $200,000 to Swiss Account 9.  The following day, Rincon sent the wire confirmation to **CESAR RINCON.**

101.   Similarly, on or about June 19, 2012, Rincon Company 2 transferred $115,000 to Swiss Account 9.  On or about June 21, 2012, Rincon forwarded the wire confirmation to **CESAR RINCON**, who replied, as translated into English, "All good, Thanks."

102.   On several occasions, **ISTURIZ** referenced the fact that the financial transactions through which he sought to receive bribe payments were designed to conceal the nature and ownership of the proceeds.  On or about July 12, 2012, **ISTURIZ** forwarded account and wire information for U.S. Account 1 from ISTURIZ Associate 1 to Rincon and Shiera, copying ISTURIZ Associate 1. **ISTURIZ** stated, as translated into English, "I am sending the instructions in order to start using this route.  Copy to the person who is responsible for setting everything up so that it is all really well shielded."

103.   On or about July 24, 2012, Shiera Company 6 transferred $323,045.27 to U.S. Account 1.

104.   On or about July 31, 2012, Rincon Company 2 transferred $450,000 from its account in the Southern District of Texas to U.S. Account 1.

105.   On or about August 1, 2012, Rincon Company 2 transferred

29

$533,729.77 from its account in the Southern District of Texas to U.S. Account 1.

106.   On or about August 10, 2012, U.S. Account 1 transferred $445,785 to Swiss Account 7.

107.   On or about August 13, 2012, U.S. Account 1 transferred $625,056 to Swiss Account 7.

108.   On or about August 29, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "I am sending you the list up to this week's proposal, which I am putting together.  The numbers are going to stay like this! Merry Christmas even though it isn't."  Attached were four charts – the first two set forth various Rincon companies and various Shiera companies, along with the amounts that each had been paid by PDVSA over the course of several weeks.  The second two, entitled "RR" and "AS," respectively, set forth various payment amounts and payment destinations for bribe payments to **ISTURIZ**.

109.   On or about November 30, 2012, Shiera sent **DE LEON** a BBM message stating, as translated into English, "I have $20MM approved to collect for this week.  I'd appreciate your help with at least one invoice for 15MM.  Let me know."  On the same day, **DE LEON** replied, "I'll help you with the payment."

110.   On or about February 19, 2013, Rincon Company 2 transferred $200,000 to an account in the name of REITER Relative 1.  Rincon sent the

payment confirmation to **REITER** by e-mail.

111.   On or about February 21, 2013, Rincon Company 2 transferred $250,000 to an account in the name of REITER Relative 1.   Rincon sent the payment confirmation to **REITER** by e-mail.

112.   **DE LEON** and **VILLALOBOS** continued to act as intermediaries between Rincon and Shiera and PDVSA officials.   For example, on or about March 11, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Did you get the second one for Nadal [**REITER**]?   The one for 130?" Shiera sent **VILLALOBOS** a BBM message stating, as translated into English, "The $130k transfer was returned to me, they say that the iban is wrong.   Can you ask for it again?   This is Nadal's [**REITER's**]."   **VILLALOBOS** responded, as translated into English, "Yes that is it, I'm going to ask for it."

113.   For example, in or about March 13, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Brother, I met with Primo [**CESAR RINCON**], I asked him to adjust the proposal with around 75 percent of your invoice to convince [Official A] to sign it. . . ."

114.   In addition, on or about May 3, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "[Official A] wrote to me, he said he got a good ration this week."

115.   In order to disguise the nature and ownership of the bribe proceeds,

instead of having money sent directly to an account he controlled, **REITER** frequently directed bribe money to third parties for his benefit. For example, **REITER** directed that some of the money he was owed in connection with the scheme be used to purchase a condominium in the name of a company controlled by REITER Relative 1. On or about August 16, 2012, a representative of Law Firm 1 sent Rincon Associate 1 the closing documents for a condominium at the Four Seasons in Miami and requested that Rincon Associate 1 direct REITER Relative 1 to execute the documents. The documents reflected that the buyer of the condominium was a Florida corporation of which REITER Relative 1 was the president.

116. On or about August 17, 2012, Rincon sent **REITER** an e-mail, attaching the closing documentation referenced in Paragraph 115 above, stating, as translated into English, "I need this signed by [REITER Relative 1] and returned to me." On or about August 21, 2012, **REITER** returned the documents referenced in Paragraph 115 to Rincon by e-mail, executed by REITER Relative 1.

117. On or about August 23, 2012, Rincon Company 5 transferred $867,619.62 to Law Firm 1's attorney trust account, in connection with the purchase of the condominium for **REITER** referenced in Paragraph 115 above.

118. **REITER** also directed Rincon to invest in a film on his behalf. After **REITER** forwarded Rincon an investment agreement from Production Company

32

A to invest in a film, on or about May 21, 2013, at the direction of Rincon

Associate 1, Rincon Company 7 transferred $1.5 million to Production Company

A. Rincon sent the confirmation of the transfer to **REITER** by e-mail.

119.   On or about September 14, 2013, Rincon, copying **CESAR**

**RINCON**, directed a relative by e-mail to send $200,000 to Swiss Account 8.

**CESAR RINCON** replied, as translated into English, "Thanks Cousin!"

120.   On or about September 16, 2013, Rincon Company 2 transferred

$200,000 to Swiss Account 8.

### Gifts and Other Things of Value

121.   In addition to monetary bribes, Rincon and Shiera provided the

Defendants with gifts, recreational travel, and other things of value in exchange for

their assistance in connection with Rincon's and Shiera's business with PDVSA.

122.   For example, on or about November 30, 2011, Shiera received a

reservation confirmation by e-mail for a beach house in Parrot Cay in the Bahamas

made in the name of **ISTURIZ**, which Shiera then forwarded on to **ISTURIZ**

noting, as translated into English, "Done, Piojo."

123.   Similarly, on or about June 6, 2013, a luxury hotel in Aruba sent

Shiera confirmations for a number of hotel rooms, including one for **CESAR**

**RINCON** and **REITER**.  A note next to both **CESAR RINCON**'s and

33

REITER's room confirmations stated, "This room will be paid by Mr. Shiera."

124.   In addition, on or about January 15, 2013, Rincon Company 2 purchased a $107,500 armored car from a company in Texas for the benefit of **REITER.**  On or about March 18, 2013, Rincon Company 2 purchased a second $107,500 armored car from a company in Texas for the benefit of **REITER.**

125.   On or about August 1, 2013, Rincon purchased a $10,300 handbag for REITER Relative 1 at a store in the Southern District of Texas.

126.   On or about June 26, 2014, **REITER** forwarded Rincon invoices for English classes for two of Official B's children, one in the amount of $16,672 and the other in the amount of $8,755.

127.   On or about July 4, 2014, Rincon Company 2 made two transfers, one in the amount of $16,672 and the other in the amount of $8,755, to a bank account in the name of the school where Official B's children were taking English classes.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT TWO
### (Conspiracy – 18 U.S.C. § 371)

### (Defendants DE LEON and VILLALOBOS)

128.   Paragraphs 1 through 38 and 41 through 127 are realleged and incorporated by reference as though fully set forth herein.

129.   Beginning in at least 2011 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendants,

### LUIS CARLOS DE LEON PEREZ
### and
### NERVIS GERARDO VILLALOBOS CARDENAS

did willfully and knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is:

to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of:  (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in

35

violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

## Purpose of the Conspiracy

130.   The purpose of the conspiracy was for **DE LEON, VILLALOBOS**, and their co-conspirators, to enrich themselves and others by directing bribes to PDVSA officials to assist Rincon, Shiera, and others in obtaining and retaining lucrative energy contracts with PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials, and by keeping a portion of those bribes.

## Manner and Means of the Conspiracy

131.   The manner and means by which **DE LEON** and **VILLALOBOS** and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

36

132.   **DE LEON** and **VILLALOBOS** offered Rincon and Shiera, as well as others, the opportunity to receive payment priority over other PDVSA vendors on outstanding PDVSA invoices and to receive assistance in winning future PDVSA contracts, in exchange for bribes paid to members of the "management team," including **CESAR RINCON, ISTURIZ, REITER,** Official A, and Official B, of which **DE LEON** and **VILLALOBOS** would receive a portion.

133.   At the direction of **DE LEON** and **VILLALOBOS,** Rincon and Shiera, together with others, paid bribes to the management team through the use of interstate and foreign wires in order to secure any improper business advantage, influence acts and decisions of the PDVSA officials, including **CESAR RINCON, ISTURIZ,** and **REITER** in their official capacities, and to induce the PDVSA officials to do and omit to do certain acts, including, but not limited to:

a.   including Rincon's and Shiera's companies on payment proposals and approving those payment proposals so that Rincon's and Shiera's companies could receive payments on outstanding PDVSA invoices;

b.   assisting Rincon's and Shiera's companies in winning PDVSA contracts;

c.   providing Rincon and Shiera with inside information concerning the PDVSA bidding process;

37

d.      placing one or more of Rincon's and Shiera's companies on certain bidding panels for PDVSA projects;

e.      ensuring that Rincon and Shiera were not subject to any internal investigations at PDVSA.

134.   At the direction of **DE LEON** and **VILLALOBOS,** Rincon and Shiera, together with others, caused bribe payments to be wired from the bank accounts of Rincon's companies and Shiera's companies to bank accounts controlled by **DE LEON** and **VILLALOBOS** with the understanding that the funds would be split among **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ, REITER,** Official A, and Official B.

135.   In addition to monetary bribes, Rincon and Shiera, together with others, provided other things of value to the management team, including **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER,** including recreational travel, vehicles, gifts (including watches and wine), meals, and entertainment, in order to receive payment priority on outstanding PDVSA invoices and to obtain and retain business with PDVSA.

## Overt Acts

136.   In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the

38

Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

137. On or about September 16, 2011, Swiss Banker 1 e-mailed Shiera, **VILLALOBOS,** and **DE LEON,** stating that Swiss Company A had set up four bank accounts – Swiss Account 1, which Swiss Banker 1 referred to as the "main account," Swiss Account 2, which Swiss Banker 1 identified as being for **VILLALOBOS,** Swiss Account 3, which Swiss Banker 1 identified as being for **DE LEON,** and Swiss Account 4, which Swiss Banker 1 identified as being for Official A. Swiss Banker 1 concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

138. On or about December 7, 2011, Swiss Account 5 transferred $602,790.96 to Swiss Account 1.

139. On or about December 16, 2011, Shiera Company 5 transferred $47,212.14 to Swiss Account 1.

140. On or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, It Is vital the flow comes in December," which the conspirators understood to refer to bribe payments." Shiera responded, as translated into

39

English, "He just confirmed you'll have it before this Friday."

141.   On or about December 21, 2011, Swiss Account 1 made two transfers to Swiss Account 3, one in the amount of $587,269.20 and another in the amount of $1,370,294.80.

142.   On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the amount of $362,485.68.

143.   On or about December 23, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Do you know if that invoice of mine was paid?" Shiera replied, as translated into English, "Brother, the 1000 will be deposited on Monday."

144.   On or about December 27, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "The deposit for the little stick has not arrived, sorry to bother you, but it is vital for this week."

145.   On or about January 4, 2012, Shiera Company 5 transferred $60,658.26 to Swiss Account 1.

146.   On or about February 10, 2012, Swiss Account 5 transferred $1,373,227.89 to Swiss Account 1.

147.   On or about February 13, 2012, Shiera Company 5 transferred

40

$121,300.70 to Swiss Account 1.

148. On or about February 15, 2012, Shiera sent **DE LEON** a BBM message stating, as translated into English, "Last week the payment for $322,021 was completed in two parts, one is for $121,400 and the other is $200,621. On the other hand, this week we are paying $1,785,223 corresponding to $1,000,000 for the plane and $788,255 from the last collection received."

149. On or about February 15, 2012, Swiss Account 5 transferred $611,211.52 to Swiss Account 1.

150. On or about February 16, 2012, Shiera Company 5 transferred $200,522.43 to Swiss Account 1.

151. On or about February 17, 2012, Rincon Company 3 transferred $257,436 to Swiss Account 1.

152. On or about February 21, 2012, Swiss Account 1 transferred $4,000,000 to Swiss Account 3 and $1,400,000 to Swiss Account 4.

153. On or about March 15, 2012, **DE LEON** sent Shiera a BBM message stating, as translated into English, "Were you able to able to buy the things? Debt from the friends as of today $1,093,232," which the conspirators understood to be a reference to outstanding bribe payments.

154. On or about March 19, 2012, Swiss Account 5 transferred

41

$536,005.42 to Swiss Account 1.

155.  On or about March 20, 2012, Shiera Company 5 transferred $281,781.34 to Swiss Account 1.

156.  On or about March 22, 2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

157.  On or about November 30, 2012, Shiera sent **DE LEON** a BBM message stating, as translated into English, "I have $20MM approved to collect for this week.  I'd appreciate your help with at least one invoice for $15MM.  Let me know."  On the same day, **DE LEON** replied, "I'll help you with the payment."

158.  On or about January 21, 2013, **DE LEON** sent Shiera a BBM message stating, "Enano [**VILLALOBOS**] told me to transfer you what's pending up to mid Dec.  It's about 1.5 M."

159.  On or about March 13, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Brother, I met with Primo [**CESAR RINCON**], I asked him to adjust the proposal with around 75 percent of your invoice to convince [Official A] to sign it..."

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

### (Defendant CESAR RINCON)

160.   Paragraphs 1 through 38 and 41 through 127 are realleged and incorporated by reference as though fully set forth herein.

161.   From in or around 2011 and continuing until at least 2014, in the Southern District of Texas and elsewhere, the defendant,

### CESAR DAVID RINCON GORDOY

did knowingly conspire, confederate, and agree with others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

43

## Manner and Means of the Conspiracy

162.   The manner and means by which **CESAR RINCON** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

163.   **CESAR RINCON** promised Businessman 3 assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning new PDVSA contracts, in exchange for bribe payments.

164.   **CESAR RINCON** directed bribe payments to be sent to various recipients other than himself, including companies, intermediaries, relatives, friends, and close personal associates, including payments through or to bank accounts in the Southern District of Texas, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

165.   **CESAR RINCON**, together with others, created false justifications for certain of the bribes, including invoices for services that were never performed, for the purpose of concealing and disguising the nature, source, and ownership of those bribe payments.

## Acts In Furtherance of the Conspiracy

166.   On or about February 29, 2012, **CESAR RINCON** sent Businessman 3 an e-mail, stating, as translated into English, "They are asking me over there if you sent the candy to [CESAR RINCON Relative 1]," which the conspirators

44

understood to refer to bribe payments. Businessman 3 replied, as translated into English, "That candy will be sent to [CESAR RINCON Relative 1]'s house today." Later that day, Businessman 3 wrote to **CESAR RINCON** again, stating, as translated into English, "I have a little problem with sending all of the candy today. I need to get it out of the main store to send it to the branch and you know that we have to be careful with that here but I can send a good load today."

167.   Also on or about February 29, 2012, a company controlled by Businessman 3 transferred $150,710 to an account in the name of **CESAR RINCON** Relative 1.  Businessman 3 forwarded the wire confirmation to **CESAR RINCON**, stating, as translated into English, "Sir, It was sent.  Thank you for everything. . . ."

168.   On or about November 16, 2012, **CESAR RINCON** sent Businessman 3 an e-mail stating, as translated into English, "I am attaching the invoices for [CESAR RINCON Relative 1]'s transfers."  Attached was an invoice in the amount of $110,000 from a company controlled by CESAR RINCON Relative 1 and another relative to a company controlled by Businessman 3 purportedly for "Technical assistance" on a maintenance project.

169.   On or about February 14, 2013, Businessman 3 signed a $110,000 check from a company he controlled to a company controlled by CESAR RINCON Relative 1 and another relative.  The memo line of the check referenced an invoice

45

number that matched the number on the invoice **CESAR RINCON** sent to

Businessman 3 on November 16, 2012 referenced in Paragraph 168 above.

170. On or about February 15, 2013, the check referenced in Paragraph 169

above was presented for payment.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOUR
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendants DE LEON and VILLALOBOS)

171.    Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

172.    On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendants,

### LUIS CARLOS DE LEON PEREZ
### and
### NERVIS GERARDO VILLALOBOS CARDENAS,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

A $515,513.20 wire from Rincon Company 2 to Swiss Account 1 on or about October 26, 2011.

47

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS FIVE-SEVEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant DE LEON)

173.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

174.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### LUIS CARLOS DE LEON PEREZ,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Five | March 19, 2012 | $536,005.42 transfer from Swiss Account 5 to Swiss Account 1 |
| Six | March 20, 2012 | $281,781.34 transfer from Shiera Company 5 to Swiss Account 1 |
| Seven | March 22, 2012 | $193,021.47 transfer from Shiera Company 5 to Swiss Account 1 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS EIGHT-ELEVEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant CESAR RINCON)

175.   Paragraphs 1 through 38, 41 through 127, 131 through 159, and 162 through 170 are realleged and incorporated by reference as though fully set forth herein.

176.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### CESAR DAVID RINCON GODOY,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Eight | February 29, 2012 | $150,710 wire transfer from a company controlled by Businessman 3 to a bank |

51

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| | | account in the name of CESAR RINCON Relative 1 |
| Nine | May 15, 2012 | $200,000 wire transfer from Rincon Company 2 to Swiss Account 9 |
| Ten | June 19, 2012 | $115,000 wire transfer from Rincon Company 2 to Swiss Account 9 |
| Eleven | February 15, 2013 | $110,000 check from a company controlled by Businessman 3 to a company controlled by CESAR RINCON Relative 1 and another relative |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS TWELVE-SIXTEEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant ISTURIZ)

177.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

178.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### ALEJANDRO ISTURIZ CHIESA,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Twelve | June 1, 2012 | $766,428.39 wire transfer from Rincon Company 2 to Swiss Account 7 |
| Thirteen | June 19, 2012 | $367,069.19 wire transfer from Rincon Company 2 to Swiss Account 7 |

53

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Fourteen | June 21, 2012 | $69,427.81 transfer from Rincon Company 6 to Swiss Account 7 |
| Fifteen | August 10, 2012 | $445,785 wire transfer from U.S. Account 1 to Swiss Account 7 |
| Sixteen | August 13, 2012 | $625,056 wire transfer from U.S. Account 1 to Swiss Account 7 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS SEVENTEEN-TWENTY
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant REITER)

179.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

180.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### RAFAEL ERNESTO REITER MUNOZ,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Seventeen | August 23, 2012 | $867,619.62 wire transfer from Rincon Company 5 to Law Firm 1 |
| Eighteen | February 19, 2013 | $200,000 wire transfer from Rincon Company 2 to REITER Relative 1 |

55

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|---------------------|
| Nineteen | February 21, 2013 | $250,000 wire transfer from Rincon Company 2 to REITER Relative 1 |
| Twenty | May 21, 2013 | $1,500,000 wire transfer from Rincon Company 7 to Production Company A |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

181. Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

**LUIS CARLOS DE LEON PEREZ**
**and**
**NERVIS GERARDO VILLALOBOS CARDENAS,**

that in the event of conviction of the offense charged in Count 2 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

182. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants,

**LUIS CARLOS DE LEON PEREZ,**
**NERVIS GERARDO VILLALOBOS CARDENAS,**
**CESAR DAVID RINCON GODOY,**
**ALEJANDRO ISTURIZ CHIESA,**
**and**

56

## RAFAEL ERNESTO REITER MUNOZ,

that upon conviction of any of the offenses charged in Count 1 and Counts 3 through 20 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

## PROPERTY IN SUBSTITUTION

183.   In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendants in substitution up to the total value of the property subject to forfeiture.  The United States may seek the imposition of a money judgment against each defendant.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

ABE MARTINEZ
ACTING UNITED STATES
ATTORNEY

SANDRA MOSER
ACTING CHIEF, FRAUD
SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: _____
JOHN P. PEARSON
DEPUTY CHIEF
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEY

BY: _____
AISLING O'SHEA
JEREMY R. SANDERS
TRIAL ATTORNEYS

57